UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------------X
                                                              :
CHARLES KM KAIBANDA,                                          :
                                                              :
                                    Petitioner,              :
                                                              :
                                                              :          21 Civ. 5953 (JPC)
              -v-                                             :
                                                              :          OPINION AND
                                                              :          ORDER
                                                              :
UNITED STATES CITIZENSHIP AND                                :
IMMIGRATION SERVICE, *et al.*,                               :
                                                              :
                                    Respondents.             :
                                                              :
------------------------------------------------------------------------X

JOHN P. CRONAN, United States District Judge:

Charles Kaibanda's application to become a naturalized U.S. citizen was denied by the
United States Citizenship and Immigration Service ("USCIS") because it found that he lacked
good moral character.  Whether that denial was proper turns on whether Kaibanda falsely testified
under oath during an August 31, 2015 naturalization interview with a USCIS officer.  He did.
Kaibanda testified that he had never given any false, fraudulent, or misleading information or
documentation to a U.S. Government official.  Yet on at least three occasions, he submitted to
USCIS applications seeking immigration benefits in which he claimed to have been married on
March 18, 2006.  And in August 2009, in support of an application seeking immigration benefits
for his current spouse, Kaibanda submitted a marriage certificate that similarly reflected a March
18, 2006 marriage.  By the time of his August 2015 naturalization interview, however, Kaibanda
knew that he and his spouse had not in fact been wed until December 2010 and that the March
2006 marriage certificate was fraudulent, but he failed to disclose any of this during his interview.

The Court therefore grants the Respondents' (collectively, the "Government") motion to deny Kaibanda's petition for review.

## I. Background

### A.    Underlying Facts[1]

Kaibanda is a Rwandan citizen who was born in Uganda.  Dkt. 16 ("Motion"), Exh. B ("Asylum App.") at 1-2, Exh. C ("Refugee Relative Pet.") at 1, Exh. E ("Green Card App.") at 1, Exh. G ("N-400 App.") at 1.  In April 2009, Kaibanda applied for asylum in the United States. Deft. 56.1 Stmt. ¶ 2; Asylum App. at 1; *see also* Motion, Exh. A ("N-400 Decision") at 2.  In that application, Kaibanda said that he had married Constance Lukowe on March 18, 2006 and that he had only one child.  Deft. 56.1 Stmt. ¶¶ 2-3; Asylum App at 2; *see also* N-400 Decision at 2. Kaibanda's application was approved, which granted him asylum status.  Pet. ¶ 2; *see also* N-400 Decision at 2.

---

[1] These facts are mainly drawn from Kaibanda's Petition, Dkt. 1 ("Pet." or "Petition"), the Government's statement of material facts under Local Civil Rule 56.1, Dkt. 18 ("Deft. 56.1 Stmt."), Kaibanda's affidavit and accompanying exhibits ("Kaibanda Aff."), Kaibanda's sur-reply affidavit, Dkt. 23 ("Sur-Reply Aff."), and the exhibits filed by the Government.  Kaibanda has not opposed the Government's Rule 56.1 Statement.  The Court therefore finds these facts to be true for this Opinion.  *See* S.D.N.Y. Loc. Civ. R. 56.1(c) ("Each numbered paragraph in the statement of material facts set forth in the statement required to be served by the moving party will be deemed to be admitted for purposes of the motion unless specifically controverted by a correspondingly numbered paragraph in the statement required to be served by the opposing party."); *Castro-Ramirez v. USCIS,* No. 13 Civ. 6001 (KPF), 2014 WL 2440696, at *1 n.2  (S.D.N.Y. May 30, 2014) (finding facts in Rule 56.1 Statement "to be true for the purposes of this Opinion" when converting motion to dismiss to one for summary judgment because the plaintiff did not "oppose[] Defendant's 56.1 Statement").  Rule 56.1, however, "does not absolve the party seeking summary judgment of the burden of showing that it is entitled to judgment as a matter of law, and a Local Rule 56.1 statement is not itself a vehicle for making factual assertions that are otherwise unsupported in the record."  *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 74 (2d Cir. 2001).  Thus, notwithstanding Kaibanda's failure to file a counter statement pursuant to Rule 56.1, the Court has confirmed that any assertions from the Government's statement relied upon herein are supported by the record.

Then in August 2009, Kaibanda filed a refugee/asylee relative form, called a Form I-730, on behalf of Lukowe.  Deft. 56.1 Stmt. ¶ 4; Refugee Relative Pet. at 1; *see also* N-400 Decision at 2.  In the Form I-730, Kaibanda again claimed that Lukowe was his spouse and attached a certificate purporting to reflect a March 18, 2006 marriage as proof.  Deft. 56.1 Stmt. ¶ 4; Refugee Relative Pet. at 1; Motion, Exh. D ("2006 Marriage Cert."); *see also* N-400 Decision at 2.  As discussed below, however, that March 2006 marriage certificate was fraudulent, and Kaibanda and Lukowe were not married until December 2010.  But unaware that the marriage certificate was fraudulent and that Kaibanda and Lukowe were not in fact married at the time, USCIS approved the refugee/asylee relative application for Lukowe.  Deft. 56.1 Stmt. ¶ 4; Refugee Relative Pet. at 1; *see also* N-400 Decision at 2.

Eight months later, in May 2010, Kaibanda applied to adjust his immigration status to a lawful permanent resident.  Deft. 56.1 Stmt. ¶ 5; Green Card App. at 1; *see also* N-400 Decision at 2.  In that application, Kaibanda again claimed that he married Lukowe on March 18, 2006.  Deft. 56.1 Stmt. ¶ 5; Green Card App. at 6; *see also* N-400 Decision at 2.  This time, however, he reported having not one child (as he had in his April 2009 asylum application), but two children, with the second purportedly born back in 2002.  Deft. 56.1 Stmt. ¶ 5; Green Card App. at 2; *see also* N-400 Decision at 2.  Six months later, in October 2010, USCIS approved Kaibanda's adjustment application, which made him a lawful permanent resident.  Deft. 56.1 Stmt. ¶ 5; Green Card App. at 1; *see also* N-400 Decision at 2; Pet. ¶ 29.

Three years later, in December 2013, USCIS sent Kaibanda a letter concerning Lukowe's previously approved refugee/asylee relative application.  Deft. 56.1 Stmt. ¶ 6; Motion, Exh. F ("Notice of Reopening"); *see also* N-400 Decision at 3.  That letter reported that "USCIS [had] move[d] to reopen [the application] on its own motion, with the intent to deny [it]."  Notice of

Reopening at 1.  It explained that USCIS was reopening the application because the marriage certificate that Kaibanda "submitted in support of the claimed relationship"—*i.e.*, the certificate reflecting a March 18, 2006 marriage—"ha[d] been found to be fraudulent."  *Id.* at 1; *accord* Deft. 56.1 Stmt. ¶ 6.  USCIS also explained that for Lukowe to be an eligible relative, she must have married Kaibanda before Kaibanda received asylum status.  Notice of Reopening at 1.  Kaibanda, however, "was granted asylum on May 5*,* 2009," yet he and Lukowe "were married, for immigration purposes, on December 28, 2010."  *Id.* at 1.

Seven months later, in July 2014, Kaibanda applied to become a U.S. citizen.  Deft. 56.1 Stmt. ¶ 7; N-400 App. at 1; *see also* N-400 Decision at 2.  No longer did Kaibanda claim to have been married to Lukowe in March 2006.  This time, he represented that they married in December 2010 and that he had two children.  Deft. 56.1 Stmt. ¶ 7; N-400 App. at 8, 10-11.[2]  He also answered "no" to questions about whether he had ever helped (or tried to help) anyone enter the United States illegally; given a U.S. Government official false, fraudulent, or misleading information or documentation; or lied to a federal official to obtain entry or admission into the United States or an immigration benefit while in the United States.  Deft. 56.1 Stmt. ¶ 7; N-400 App. at 11, 17; *see also* N-400 Decision at 3.

USCIS interviewed Kaibanda in connection with his naturalization application on August 31, 2015.  Deft. 56.1 Stmt. ¶ 8; N-400 App. at 20; *see also* N-400 Decision at 2.  At this naturalization interview, Kaibanda reviewed his written responses with the USCIS officer and testified that all information in the application, including certain immaterial amendments, was true.  Deft. 56.1 Stmt. ¶ 8; N-400 App. at 20; *see also* N-400 Decision at 3.  After the interview, USCIS

---

[2] Kaibanda's naturalization application listed different birthdates for his children than he had previously given to USCIS.  *Compare* N-400 App. at 10-11, *with* Asylum App. at 2, Green Card App. at 2; *see also* Deft. 56.1 Stmt. ¶ 7; N-400 Decision at 3.

4

requested that Kaibanda provide a certified marriage certificate, which he did.  Deft. 56.1 Stmt. ¶ 10; Motion, Exh. H ("N-336 App.") at 1; Motion, Exh. I ("2010 Marriage Cert."). This time, though, Kaibanda did not provide the fraudulent March 2006 marriage certificate. Instead, Kaibanda provided a marriage certificate reflecting that he married Lukowe in December 2010. Deft. 56.1 Stmt. ¶ 10; 2010 Marriage Cert.

In February 2020, USCIS denied Kaibanda's naturalization application. N-400 Decision; Deft. 56.1 Stmt. ¶ 11. The decision explained that Kaibanda had testified at his naturalization interview that the information on his naturalization application (along with all the accompanying documents and amendments) was truthful. N-400 Decision at 2; Deft. 56.1 Stmt. ¶ 11. The decision then explained that Kaibanda had falsely testified because Kaibanda had previously given false information to the Government about his marriage to Lukowe and his children, yet he testified at the interview that he had never done so. N-400 Decision at 2-3; Deft. 56.1 Stmt. ¶¶ 11-12. To that end, the decision noted that the U.S. Embassy in Kampala, Uganda concluded after an investigation that Kaibanda and Lukowe's supposed March 2006 marriage was fraudulent, that Kaibanda knew that USCIS had moved to reopen Lukowe's refugee relative application, and that Kaibanda responded to that notice of reopening by acknowledging that the marriage certificate was not registered. N-400 Decision at 2-3; *see also* Deft. 56.1 Stmt. ¶ 12.

In March 2020, Kaibanda requested a hearing on USCIS's denial of his naturalization application. Deft. 56.1 Stmt. ¶ 16; N-336 App. at 1. On June 15, 2020, a USCIS officer held a hearing at which Kaibanda reaffirmed under oath his responses in that application. Deft. 56.1 Stmt. ¶¶ 16-17; *see also* Motion, Exh. J ("N-336 Decision") at 1. A year later, on June 15, 2021, USCIS issued a decision affirming the denial of Kaibanda's naturalization application and vacating the previous decision. N-336 Decision at 1; Deft. 56.1 Stmt. ¶ 18.

### B.      Procedural History

On July 12, 2021, Kaibanda, proceeding *pro se*, petitioned this Court for *de novo* review of USCIS's decision to deny his naturalization application.  Pet. ¶ 1.  Kaibanda claims that he did not falsely testify at the naturalization interview because (1) he is married to Lukowe and has two children that he disclosed to USCIS and (2) he was unaware in 2006 that his "Church marriage" was not properly registered.  *Id.* ¶¶ 5-6, 25-26.  The Government moved to dismiss, or in the alternative for summary judgment.  Dkt. 15; Motion.  Kaibanda opposed the Motion in an affidavit, *see* Kaibanda Aff., to which the Government filed a reply memorandum, Dkt. 22 ("Reply").  In response, Kaibanda filed a sur-reply affidavit.  *See* Sur-Reply Aff.[3]

## II.  Legal Standard

### A.      Converting a Rule 12(b) Motion to a Rule 56 Motion

In the Rule 12(b) context, when a party presents matters outside the pleadings, a court has a choice.  It either can decline to consider those items or can convert the motion to a motion for summary judgment.  *See* Fed. R. Civ. P. 12(d) ("If, on a motion under Rule 12(b)(6) or 12(c), matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56."); *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002).  A district court may convert a Rule 12(b) motion to one under Rule 56 only after giving all parties "a reasonable opportunity to present all the material that is pertinent to the motion."  *Id.*  Thus, the central question in determining whether to convert a motion to dismiss to a motion for summary judgment is "whether the non-movant should reasonably have recognized the possibility that the motion might be converted into one for summary judgment or

---

[3] The Court did not grant Kaibanda leave to file the sur-reply.  But given Kaibanda's *pro se* status, the Court will consider arguments raised in the sur-reply in deciding this case.

was taken by surprise and deprived of a reasonable opportunity to meet facts outside the pleadings." *Krijn v. Pogue Simone Real Est. Co.*, 896 F.2d 687, 689 (2d Cir. 1990) (quotations omitted). This notice requirement is "particularly important" in *pro se* cases. *Beacon Enterprises, Inc. v. Menzies*, 715 F.2d 757, 767 (2d Cir. 1983).

If notice is properly given, courts have "complete discretion in determining whether to convert [a] motion to one for summary judgment." *Delgado v. City of New York*, No. 19 Civ. 6320 (JPC), 2021 WL 2473817, at *6 (S.D.N.Y. June 17, 2021) (quotations omitted). "In exercising this discretion, a court looks to the substance of the motion." *Id.* (quotations omitted). So, for instance, it is generally inappropriate to convert a motion to one for summary judgment when "material factual disputes remain, and relevant facts may be unearthed during discovery." *Id.*

Kaibanda had sufficient notice that the Court might convert the Motion to a motion for summary judgment. The Government moved to dismiss the Petition under Rules 12(b)(1) and 12(b)(6), "or, in the alternative, Rule 56 of the Federal Rules of Civil Procedure." Motion at 1. The Government then explained to Kaibanda that the Court might treat its motion to dismiss as a motion for summary judgment and informed him that if he did not respond "by filing sworn affidavits and/or other documents as required by Rule 56(c)," his "COMPLAINT MAY BE DISMISSED." Dkt. 19. And the Government "has submitted a Local Rule 56.1 Statement in connection with its motion . . . ; in response, [Kaibanda] has submitted additional matters outside of the pleadings for the Court's review." *Castro-Ramirez*, 2014 WL 2440696, at *2; *see Hernandez v. Coffey*, 582 F.3d 303, 308 n.2 (2d Cir. 2009) (citing cases finding that a Local Rule 12.1 Notice provides sufficient notice to *pro se* parties). Given, as discussed below, that no material facts remain, the Court converts the Motion to one for summary judgment.

B.      **Summary Judgment Standards**

A court should grant summary judgment only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  The moving party is entitled to judgment as a matter of law when "the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  In determining whether a genuine factual dispute exists, a court "is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments." *Weyant v. Okst*, 101 F.3d 845, 854 (2d Cir. 1996).

As noted, Kaibanda is proceeding *pro se*.  "When a *pro se* litigant is involved, the same standards for summary judgment apply, but the *pro se* litigant should be given special latitude in responding to a summary judgment motion." *Roundtree v. New York City*, No. 15 Civ. 8198 (JPC), 2021 WL 4504471, at *4 (S.D.N.Y. Sept. 30, 2021) (quotations omitted).  The Court has thus read Kaibanda's pleadings "liberally and has interpreted them to raise the strongest arguments that they suggest." *McPherson v. Coombe*, 174 F.3d 276, 280 (2d Cir. 1999) (cleaned up).  This principle, however, has limits and "does not relieve plaintiff of his duty to meet the requirements necessary to defeat a motion for summary judgment." *Jorgensen v. Epic/Sony Recs.*, 351 F.3d 46, 50 (2d Cir. 2003) (quotations omitted).  Put simply, "a *pro se* party's bald assertions unsupported by evidence" are "insufficient to overcome a motion for summary judgment." *Parker v. Fantasia*, 425 F. Supp. 3d 171, 183-84 (S.D.N.Y. 2019) (quotations omitted).

### C.      Legal Standards for Naturalization

Under Article I, Section 8 of the U.S. Constitution, "Congress shall have Power . . . [t]o establish an uniform Rule of Naturalization."  U.S. Const. art. I, § 8, cl. 4.  Congress vested the Attorney General with "sole authority to naturalize persons as citizens of the United States."  8 U.S.C. § 1421(a).  The Attorney General, in turn, "delegated that authority to USCIS."  *Rivera v. USCIS*, 5 F. Supp. 3d 439, 441 (S.D.N.Y. 2014).  If USCIS uses that authority to deny an application for naturalization, an applicant may seek judicial review in a federal district court.  8 U.S.C. § 1421(c).  A district court will then review the application *de novo*.  *Id.*  That means that the district court may rely on both the administrative record and facts established in the district court.  *See Chan v. Gantner*, 464 F.3d 289, 291 (2d Cir. 2006).

In reviewing a petition to become a naturalized citizen, "[t]he applicant bears the burden of establishing that he is entitled to naturalization."  *Rivera*, 5 F. Supp. 3d at 442; *Berenyi v. Dist. Dir., INS*, 385 U.S. 630, 637 (1967).  He may do so by showing that he has "met all statutory requirements for becoming a naturalized citizen."  *Rivera*, 5 F. Supp. 3d at 442.  To meet these statutory requirements, a person must be lawfully admitted for permanent residence, satisfy certain residency requirements, and prove that he "has been and still is a person of good moral character" in the five years before his naturalization application until "the time of admission to citizenship." 8 U.S.C. § 1427(a), (e); 8 C.F.R. § 316.10(a)(1).

### III.  Discussion

Under the Immigration and Nationality Act ("INA"), several classes of noncitizens are disqualified from satisfying the "good moral character" requirement to naturalize.  *See* 8 U.S.C. § 1101(f).  Among these are noncitizens who, "during the period for which good moral character is required to be established," gave "false testimony for the purpose of obtaining any benefits

under" the immigration laws.  8 U.S.C. § 1101(f)(6).  The term "testimony," as employed in section 1101(f)(6), is "limited to oral statements made under oath" and "does not include other types of misrepresentations or concealments, such as falsified documents or statements not made under oath." *Kungys v. United States*, 485 U.S. 759, 780 (1988) (quotations omitted).

Although section 1101(f)(6) requires for testimony to be oral statements made under oath, it lacks "a materiality requirement." *Id.*  Thus, "the [G]overnment need not show that truthful answers would have barred granting of the petition." *In re Kovacs*, 476 F.2d 843, 845 (2d Cir. 1973).  In sum, "any alien who makes false oral statements under oath . . . with the subjective intent of obtaining immigration [or naturalization] benefits is *per se* ineligible for suspension of deportation due to want of good moral character." *Medina v. Gonzales*, 404 F.3d 628, 630 (2d Cir. 2005) (quotations omitted); *Kungys*, 485 U.S. at 779-80 (holding that section 1101(f)(6) "denominates a person to be of bad moral character on account of having given false testimony if he has told even the most immaterial of lies with the subjective intent of obtaining immigration or naturalization benefits").

Whether USCIS erred in denying Kaibanda's Petition for lacking good moral character thus requires the Court to answer two questions.  First, did Kaibanda give a false oral statement under oath?  Second, if so, did Kaibanda make that statement with the subjective intent to obtain naturalization benefits?  The answer to each question is yes.

First, when USCIS interviewed Kaibanda under oath on August 31, 2015 in connection with his naturalization application, he testified falsely.  At that interview, Kaibanda reviewed the Form N-400 with a USCIS officer and testified that the information on the form, along with any amendments made during the interview, was true.  Deft. 56.1 Stmt. ¶ 8; *see* N-400 App. at 20; *see also* N-400 Decision at 3.  As particularly relevant here, he affirmed his "no" answer to the

question: "Have you **ever** given any U.S. Government official(s) **any** information or documentation that was false, fraudulent, or misleading?"  N-400 App. at 17; *see* Deft. 56.1 Stmt. ¶ 7; *see also* N-400 Decision at 3.[4]

That answer was false in at least two ways.  To start, Kaibanda had given false information to a U.S. Government official regarding the date of his marriage to Lukowe in three earlier applications to USCIS.  Kaibanda claimed that he married Lukowe in March 2006 when he applied for asylum in 2009, Asylum App. at 2, when he applied for adjustment of status in 2010, Green Card App. at 6, and when he filed a refugee/asylee relative form on behalf of Lukowe to classify her as his spouse in August 2009, Refugee Relative Pet. at 1.  *See* Deft. 56.1 Stmt. ¶¶ 2-5; *see also* N-400 Decision at 2.  Despite these claims, Kaibanda did not legally marry Lukowe until December 2010.  *See* Deft. 56.1 Stmt. ¶¶ 6, 14; 2010 Marriage Cert.; N-400 App. at 8;  *see also* Notice of Reopening at 1; N-400 Decision at 3.

Besides providing this false information concerning his marriage date, Kaibanda also had given a fraudulent document to a U.S. Government official.  As part of the August 2009 refugee/asylee relative application for Lukowe, Kaibanda attached the March 2006 marriage certificate as proof that she was his spouse.  Deft. 56.1 Stmt. ¶ 4; Refugee Relative Pet.; 2006 Marriage Cert.  As Kaibanda now acknowledges, that 2006 marriage certificate was fraudulent. *See* Pet. ¶ 21 (Kaibanda's "sister forged a marriage certificate"); ¶ 24 (Kaibanda's "sister

---

[4] In the N-400 decision, USCIS also found that Kaibanda falsely testified under oath when he affirmed his negative responses to two other questions: (1) whether he "ever . . . [h]elped anyone to enter, or to try to enter, the United States illegally" and (2) whether he "ever lied to any U.S. Government official to gain entry or admission into the United States or to gain immigration benefits while in the United States." *See* N-400 Decision at 3; Deft. 56.1 Stmt. ¶ 7; *see also* N-App. at 16-17.  The Court need not reach whether Kaibanda falsely testified under oath with respect to those two questions because he falsely testified under oath as to whether he had ever given a U.S. Government official any false, fraudulent, or misleading information or documentation.

intentionally messed up registration of [his] Church marriage"); p.13 (referring to the 2006 marriage certificate as "a faulty church marriage certificate").

By the time of the August 31, 2015 naturalization interview, Kaibanda knew that he had not been married until October 2010 and that the March 2006 marriage certificate was fraudulent. The evidence is overwhelming and not disputed.  In December 2013, USCIS sent Kaibanda a notice explaining that—in response to the application he had filed on behalf of Lukowe—the March 2006 "marriage certificate submitted in support of the claimed relationship has been found to be fraudulent."  Deft. 56.1 Stmt. ¶ 6; Notice of Reopening at 1; *see also* N-400 Decision at 3. That letter also explained that Kaibanda was not legally married until December 28, 2010.  Notice of Reopening at 1.  And in July 2014, Kaibanda listed on his N-400 application that he was married on December 28, 2010.  N-400 App. at 8; Deft. 56.1 Stmt. ¶ 7; *see also* N-400 Decision at 3.[5] Kaibanda thus knew by his August 31, 2015 naturalization interview that he had previously provided the U.S. Government false information and fraudulent documentation about when he was legally married.  Yet he testified at that interview that he had never done so.  He therefore made a false statement under oath.  *See Rivera*, 5 F. Supp. 3d at 442-43 (finding petitioner ineligible for naturalization after petitioner gave false testimony "under oath at his naturalization interview"); *see also Bijan v. USCIS*, 900 F.3d 942, 946 (7th Cir. 2018) ("[L]ying about previous lies . . . reveals a lack of good moral character." (cleaned up)); *United States v. Haroon*, 874 F.3d 479, 483 (6th Cir. 2017) ("Lies about prior false testimony given for the purpose of obtaining immigration benefits . . . reveal a lack of good moral character.").[6]

---

[5] The N-400 application has a scrivener error listing the marriage date as "12/28/1010." N-400 App. at 8.

[6] Kaibanda reaffirmed his answers in the Form N-400, including whether he had ever given any U.S. Government official any information or documentation that was false, fraudulent, or

Second, Kaibanda intended to obtain an immigration benefit—naturalization—when he testified at the August 31, 2015 naturalization interview, including when he denied ever giving false, fraudulent, or misleading information or documents to a U.S. Government official. The purpose of that interview, after all, was for USCIS to consider Kaibanda's application for naturalization. From Kaibanda's perspective, his objective of course was to secure the immigration benefit of naturalization. And the false statements were made in the context of the USCIS officer reviewing the accuracy and truthfulness Kaibanda's naturalization application with him. When someone gives testimony to USCIS that he knows to be false under circumstances like those presented here, that individual acts with the intent to obtain a naturalization benefit. *See, e.g.*, *Yemer v. USCIS*, 359 F. Supp. 3d 423, 431 (E.D. Va. 2019) ("There can be no doubt that one who falsely denies during a naturalization interview that she has previously given false or misleading information to a government official does so for the purpose of obtaining naturalization benefits."); *Bijan*, 900 F.3d at 946 ("The undisputed facts show that [the petitioner] was aware of the misrepresentation on his visa application and thus that he intended to obtain an immigration benefit—naturalization—by denying that he had made it."). The Court thus finds that Kaibanda intended to obtain an immigration benefit when he affirmed, untruthfully, that he had never given false information or fraudulent documentation to a U.S. Government official.

Kaibanda does not substantively challenge the above issues. Instead, he first claims that the errors in his earlier applications about how many children he had and their birthdays were

---

misleading, at the hearing challenging USCIS's denial of his naturalization application. Deft. 56.1 Stmt. ¶¶ 16-17; *see* N-336 Decision at 1. But the Government does not argue that Kaibanda's testimony at this hearing provides an independent ground for denying the Petition. Motion at 1, 15-17 (only arguing that Kaibanda falsely testifying at his naturalization hearing warrants denying the Petition). Because Kaibanda's false testimony at the August 31, 2015 naturalization interview shows Kaibanda lacks good moral character, the Court need not decide whether Kaibanda's later testimony provides an alternate ground for denying his Petition.

simply typographical errors.  Opposition ¶¶ 4-5; Sur-Reply ¶¶ 3-4.  But even if the inconsistent information Kaibanda provided about his children could somehow be dismissed as typographical errors, which certainly strains credibility, it does not address his untruthful affirmation at the August 31, 2015 interview that he had never submitted false information or fraudulent documentation to a U.S. Government official.[7]

Next, Kaibanda argues that when he applied for asylum, his wife's refugee/asylee relative status, and his green card, he believed that his 2006 "Church marriage" was a legally valid marriage.  Opposition ¶¶ 5-6, 8-10.  This argument misses the point.  It does not matter whether Kaibanda thought he was legally married when he applied for asylum, for refugee/asylee relative status for Lukowe, and for a green card.  Instead, what matters is whether Kaibanda knew on August 31, 2015—at his naturalization interview—that he previously had submitted false, fraudulent, or misleading information or documentation to a U.S. Government official.  He clearly did.  He similarly claims that USCIS "cleared" his wife and children to enter the United States and allowed them to remain, which shows that "Lukowe and [Kaibanda] are married."  *Id.* ¶ 6.  But even if Kaibanda and Lukowe are currently married, which appears to have been the case since December 2010, that does not change the fact that he previously provided false information and fraudulent documentation to USCIS that reflected a March 2006 wedding.

Kaibanda next claims that USCIS "agreed with [him] that [he] did not commit any fraud" because it allowed Lukowe and his children to join him in the U.S., which showed that he had not

---

[7] Because the Court finds that Kaibanda testified untruthfully that he never gave false information or a fraudulent document to a U.S. government official, in light of his prior representations in immigration applications that he was married on March 18, 2006 and his submission of a certificate reflecting a marriage on that date, the Court also need not reach whether his prior inconsistent statements regarding his children, combined with that subsequent testimony denying ever giving false information to a U.S. government official, provides an alternative basis for denying the Petition.

"committed fraud during the application process."  Opposition ¶ 8.  That argument too misses the point.  It does not matter why USCIS ultimately allowed his wife to stay in the country.  Again, what matters is whether Kaibanda knew by his August 31, 2015 naturalization interview that he previously had provided the U.S. Government false information or fraudulent documentation.  Despite knowing that he had done so, Kaibanda falsely averred otherwise at the interview.

Lastly, Kaibanda contends he has "impeccable character" and is a "hardworking . . . permanent resident" who has lived in the United States for over a decade with no "issues with law enforcement."  *Id.* ¶ 10.  While all that may be true, section 1101(f)(6) expressly bars his receipt of naturalization because he made false oral statements under oath, with the subjective intent of obtaining naturalization, within five years of his naturalization application.[8]

## IV.  Conclusion

Kaibanda gave false testimony under oath, and he did so to try to gain U.S. citizenship.  That means that, under section 1101(f)(6), Kaibanda lacks good moral character and is statutorily ineligible to naturalize within five years of making those statements.  The Court therefore grants the Government's Motion for summary judgment and denies Kaibanda's Petition for review.

---

[8] While the Petition only seeks relief under section 1421(c), it lists the Administrative Procedure Act ("APA") and the Declaratory Judgment Act ("DJA") as conferring jurisdiction.  Pet. ¶¶ 1,7.  Neither statute provides Kaibanda with a separate right of action.  "Courts are unanimous in holding that § 1421(c) is the sole means of seeking judicial review of the actual denial of naturalization application."  *Miriyeva v. USCIS*, 436 F. Supp. 3d 170, 178 n.11 (D.D.C. 2019), *aff'd* 9 F.4th 935 (D.C. Cir. 2021).  That unanimity makes sense.  First, "[t]he DJA is procedural only, and does not create an independent cause of action."  *Chevron Corp. v. Naranjo*, 667 F.3d 232, 244-45 (2d Cir. 2012) (quotations omitted).  Second, "[t]he APA only provides for judicial review of actions that are reviewable by statute or any 'final agency action for which there is no other adequate remedy in a court.'"  *De Dandrade v. U.S. Dep't of Homeland Sec.*, 367 F. Supp. 3d 174, 187 (S.D.N.Y. 2019), *aff'd* 975 F.3d 120 (2d Cir. 2020).  Here, "there is another 'adequate remedy' through the review process explicitly granted by the INA[;] [a]ll relief that individual plaintiffs seek may be granted under section 1421(c)."  *Id.*

The Clerk of the Court is respectfully directed to close this case.

SO ORDERED.

Dated: June 17, 2022
      New York, New York

                                                                 JOHN P. CRONAN
                                                  United States District Judge

16